**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

GM CASTING HOUSE, INC.,

    Plaintiff,

v.

                                       CASE NO. 1:24 cv-1821

FOREVER COMPANIES, INC.,

    Defendant.

**PLAINTIFF'S COMBINED REPLY IN SUPPORT OF RULE 25(c) MOTION TO JOIN DIAMOND NEXUS, LLC AS JUDGMENT DEBTOR AND MOTION FOR TURNOVER**

Diamond Nexus LLC's ("DNLLC") opposition papers raise more questions than they answer. While DNLLC attempts to characterize the sale of Forever Companies, Inc.'s ("FCI") "Diamond Nexus" business as a routine transaction, the timing and surrounding circumstances of that transfer remain inadequately explained and suspicious. As the record reflects, DNLLC was formed on December 6, 2024 (ECF No. 64-4 (Mot. Ex. 4))—after this litigation had progressed through pleadings, settlement discussions, and discovery disputes—and expressly "formed to acquire certain assets of Forever Companies, Inc." ECF No. 71 (Affidavit of David Barr ("Barr Aff.") ¶ 1). And yet, the purported transaction was not consummated until April 4, 2025, months later. *Id.* ¶ 5, Ex. A. In the interim, FCI remained an active participant in this litigation, appearing through its corporate representative at court hearings and continuing to litigate the case, all without disclosing to Plaintiff or the Court that its business was in the process of being transferred to a newly formed entity. Only once the default judgment was looming did FCI supposedly surrender its assets, cease operations, and formally dissolve—leaving GM with a substantial judgment against an entity that no longer exists and, according to DNLLC's

Opposition, no longer has any assets

DNLLC offers no credible explanation for why a newly formed entity, purportedly unrelated to FCI, emerged at this critical juncture to acquire and continue FCI's business operations. Nor does it reconcile the unexplained gap between its formation and the ultimate transfer, during which FCI continued to litigate while withholding material information about its impending dissolution. Also conspicuously absent are copies of any of the recorded UCC-1 security interests that were supposedly recorded by Byline Bank, or any information regarding the amount of FCI's indebtedness secured by those UCC-1s. Those unanswered questions—and the undisputed continuity of the Diamond Nexus business—confirm, at a minimum, that further discovery is warranted.

## I. DNLLC Fails to Rebut the Evidence of "Mere Continuation"

DNLLC does not meaningfully dispute that the Diamond Nexus business continued uninterrupted after the transfer—and it cannot. The same operations, trade name, website, and customer-facing business that existed under FCI continue today under DNLLC. Nor does DNLLC dispute that key management personnel remained in place across the transition, including Ms. Brianne Schroeder, who executed the NDA that was at issue in this lawsuit on behalf of FCI and now serves as President of DNLLC.

Instead, DNLLC relies almost entirely on a single, self-serving assertion that there is no common ownership because its sole member allegedly never held an ownership interest in FCI. *See generally* Barr Aff. That assertion does not resolve the inquiry and, at this stage, raises more questions than it answers. DNLLC relies heavily on *Gallenberg Equip., Inc. v. Agromac Int'l, Inc.*, 10 F. Supp. 2d 1050 (E.D. Wis. 1998), *aff'd*, 191 F.3d 456 (7th Cir. 1999), for the proposition that common ownership is a "key" factor to determine the issue of mere continuation. But even

*Gallenberg* recognized that courts may consider the broader circumstances of the transaction, including the presence of formal or informal ties between the entities and whether the transfer was supported by adequate consideration. 10 F. Supp. 2d at 1053–54.

Consistent with that approach, courts have made clear that continuity of ownership does not require *complete* identity of ownership. *See Workforce Sols. v. Urb. Servs. of Am., Inc.*, 2012 IL App (1st) 111410, ¶ 89 ("[C]omplete unity is not required to establish mere continuation."). Moreover, even without *any* overlap in formal ownership, courts look beyond mere labels where the same individuals remain closely involved in the successor's ownership, management, and operations. *See, e.g., Steel Co. v. Morgan Marshall Indus., Inc.*, 278 Ill. App. 3d 241, 248–49, 662 N.E.2d 595, 600 (1996) (finding continuity where the predecessor's sole shareholder did not formally own the successor but remained its chief executive officer and operational manager, while his spouse acquired a controlling ownership interest); *Lincoln National Life Insurance Co. v. Nicklau, Inc.*, 2000 WL 656683, at *4 (N.D. Ill. May 17, 2000) (finding continuity where a new entity was formed during litigation with nominally different ownership, but the same small group of family members remained "substantially intertwined" in ownership, management, and control of the business despite formal changes).

Here, DNLLC's opposition speaks only to formal ownership by one individual. It does not address whether FCI's former owners, principals, or insiders retained any role, influence, or financial stake in DNLLC, directly or indirectly, or whether they facilitated the transaction. Nor does DNLLC provide any insight into the relationship between its sole member, David Barr, and any former owner, principal, or insider of FCI at the time of the transfer—individuals whose identities and roles remain unknown on this record. There is also no information regarding the sale from Byline to DNLLC, including how the sale was advertised, who else submitted bids and in

what amounts, what was done to ensure that Byline received fair market value for FCI's assets, and whether the funds received were sufficient to satisfy FCI's alleged indebtedness to Byline and whether there was any surplusage.

This lack of disclosure is particularly troubling considering Byline Bank apparently issued a Notification of Disposition of Collateral in late November 2024 (Doc. 69, pp. 26-28), on which David Barr is not listed as a recipient. Yet despite this lack of notice, by December 6, 2024, Barr had formed DNLCC to purchase FCI's assets (Doc 64, p. 7 at 28) and then on April 4, 2025, the day *after* FCI voluntarily surrendered all of its assets to Byline Bank (Doc. 69, p. 20), DNLCC, in a document signed by Barr, claims to have purchased all of those assets. (Doc 69, p. 16) The disclosed and undisclosed portions of this transaction, combined with Brianne Schroeder's continuity in leadership during DNLLC's formation and FCI's dissolution, certainly supports an inference of continuing control.

At a minimum, the present record demonstrates that targeted discovery is warranted to determine the nature and extent of any involvement by FCI's former owners with DNLLC and by DNLLC's current owners with FCI. *See Steel Co.*, 662 N.E.2d at 600 ("A creditor's rights cannot be cut off by a corporation which merely puts on a new coat."); *Lincoln Nat. Life Ins. Co. v. Nicklau, Inc.*, No. 98 C 2453, 2000 WL 656683, at *4 (N.D. Ill. May 17, 2000) (noting the nominal transfer was a "ruse" and "transparent attempt to escape the liabilities about to be incurred "). At a minimum, this discovery should include the production of all applicable UCC-1 statements and related financing documents, documents related to the marketing and sale of FCI's assets, the deposition of DNLLC's David Barr, one or more 30(b)(6) deposition witnesses from Byline Bank and the deposition Brianne Schroeder at DNLLC.

## II. The Timing and Circumstances of the Transfer Support a Strong Inference of Fraudulent Purpose

The badges of fraud laid out in the Uniform Fraudulent Transfer Act (740 ILCS 160/5(b)) continue to support a finding of fraudulent intent sufficient to impose successor liability. Every relevant factor remains present, and several are even more pronounced.

First, the transfer of Diamond Nexus was concealed, and the surrounding circumstances strongly suggest it was deliberately hidden from Plaintiff and this Court to evade the Court's judgment. DNLLC's own records show that FCI had defaulted on its loan sometime before November 22, 2024 (Barr Aff. Ex. A at 13), and DNLLC was formed just two weeks later on December 6, 2024,[1] for the express purpose of acquiring FCI's assets (*id.* ¶ 1). Yet FCI never disclosed to Plaintiff or the Court that its business was to be sold or transferred. To the contrary, the Diamond Nexus business continued to operate publicly over the ensuing months as if nothing had changed.

More troubling, FCI continued to actively litigate this case throughout this entire period. It appeared before the Court, participated in proceedings, and, on March 10, 2025, represented that it intended to retain new counsel—thereby delaying the entry of default (*see* ECF No. 49)—while withholding the material fact that its operating business was being transferred to a new entity formed in December 2024 for the sole purpose of acquiring all of FCI's assets and operations.

The timing of the ultimate transfer was all the more suspicious. Although DNLLC was formed in December 2024 for the express purpose of acquiring FCI's assets, the transfer was not consummated until April 4, 2025 (Barr Aff. Ex. A)—the same day Plaintiff submitted its

---

[1] On that same day, FCI's former counsel represented that FCI was "moving toward liquidation." ECF No. 64-1 (Kroll Decl.) ¶ 7.

declaration supporting damages (ECF No. 54)—but prior to this Court's entry of default judgment.

The timing and progression of these events suggest that FCI transferred its assets in anticipation of, and for "the fraudulent purpose of avoiding," the judgment in this case. *Kalagian v. ClearFlame Engines, Inc.*, No. 24-CV-50471, 2025 WL 2076662, at *3 (N.D. Ill. July 23, 2025) (allegations that lawsuit had been filed against predecessor, successor plausibly knew about the suit, and all of predecessor's assets have been transferred resulting in its insolvency sufficient to plausibly indicate successor liability)

The remaining badges of fraud are equally clear and unrebutted. The transfer occurred after FCI had been sued. It involved substantially all of FCI's operating business, which DNLLC now continues to run without interruption. FCI then dissolved, confirming insolvency. And the transaction was executed in direct proximity to the imposition of a substantial judgment. DNLLC does not meaningfully address any of these facts. And though DNLLC now claims that it purchased the Diamond Nexus business assets for $2 million, it fails to establish that the amount paid was "reasonably equivalent to the value of assets transferred." *Mamacita, Inc. v. Colborne Acquisition Co., LLC.*, No. 10 C 6861, 2011 WL 881654, at *6 (N.D. Ill. Mar. 11, 2011).

Taken together, these facts strongly suggest a coordinated effort to preserve FCI's business while placing its assets beyond the reach of creditors. *See Kalagian*, 2025 WL 2076662, at *3 . This is precisely the circumstance in which successor liability is warranted or, at a minimum, where discovery is required.

## III.    DNLLC's Jurisdictional Argument Does Not Preclude Joinder

DNLLC's personal jurisdiction argument likewise provides no basis to deny GM's motion at this stage. It is well established that successor liability can provide a basis for exercising jurisdiction over the successor entity. "In the corporate successor context, the successor

corporation has chosen to stand in the shoes of its predecessor and has chosen to accept the business expectations of those who have dealt previously with that predecessor." *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 784 (7th Cir. 2003). Accordingly, successors "can be expected to be haled into the same courts as [their] predecessor[s]." *Id.; see also BIC Corp. v. Chicago Imp., Inc.*, 540 F. Supp. 3d 786, 795 (N.D. Ill. 2021) (denying motion to dismiss for lack of personal jurisdiction where allegations were sufficient to demonstrate prima facie case of successor liability).

**IV.     Any Deficiencies in the Request for Relief in the Turnover Motion Can Be Cured by the Court.**

DNLLC has opposed Plaintiff's Motion for Turnover Order of the DIAMOND NEXUS, NEXUS DIAMOND and 12FIFTEEN trademarks based, primarily, on the unsubstantiated assertion that FCI no longer owns those marks. As with its arguments with respect to the Rule 25(c) Motion, DNLLC asserts, without attaching copies, that all of FCI's assets, including its trademarks, were subject to a properly recorded security interest in favor of Byline Bank. DNLLC then asserts that FCI voluntarily transferred all collateral subject to that security interest to Byline Bank, who then sold it, almost immediately, to DNLLC through a private sale. For the reasons set forth above with respect to the Rule 25(c) Motion, DNLLC's assertions should, at a minimum, be vetted through some basic discovery before the Court denies either of Plaintiff's motions. Such discovery should include, at a minimum, recorded copies of all relevant UCC-1 statements, documents related to the sale and disposition of FCI's assets and the depositions of DNLLC's David Barr, a 30(b)(6) witness from Byline Bank and Brianne Schroeder.

As for DNLLC's lone other argument, that the Motion for Turnover Order should be denied because it seeks turnover directly to Plaintiff, rather than to the Sheriff for sale, the Court can easily address that by entering an order directing that the assets be turned over to the Sheriff for sale in satisfaction of Plaintiff's judgment. There is no basis for denying Plaintiff's Motion for Turnover Order solely for the fact that the motion seeks a turnover directly to Plaintiff. As the cases cited in Plaintiff's Motion for Turnover Order state (Doc 62, ¶¶ 6-10), section 2-1402 is "to be liberally construed" and the court, by appropriate order of judgment, may compel the judgment debtor to deliver up assets directly to the judgment creditor. In accordance with this cited authority, to the extent that the trademarks at issue were demonstrably and legally transferred to DNLLC, and/or if DNLLC is determined to be the successor to FCI pursuant to Rule 25(c), the Court should enter an appropriate order directing that those trademarks be turned over to the appropriate entity for Plaintiff's benefit in satisfaction of its judgment.

## V.    CONCLUSION

DNLLC's opposition fails to dispel the substantial evidence that it is a mere continuation of FCI and that the transfer of FCI's assets was undertaken under circumstances strongly indicative of a fraudulent effort to evade liability. At a minimum, the unresolved questions surrounding the timing, structure, and participants in the transaction warrant the limited discovery requested above.

Accordingly, GM respectfully requests that the Court grant its Rule 25(c) motion and join Diamond Nexus, LLC as a judgment debtor and order that the trademarks registered in the name of FCI be turned over to the appropriate entity for Plaintiff's benefit. In the alternative, GM requests leave to conduct limited discovery directed to the issues of successor liability, continuity of ownership and control, and the circumstances of the asset transfer.

Dated: May 20, 2026

Respectfully submitted,

**GM Casting House, Inc.**

*/s/ Daniel C. Curth*
One of Its Attorneys

Daniel C. Curth
TUCKER ELLIS LLP
233 South Wacker Drive, Suite 6950
Chicago, IL 60606
Phone: (312) 624-6300
Fax: (312) 624-6309
daniel.curth@tuckerellis.com